### UNITED STATES v. UNIVERSAL MILK BOTTLE SERVICE, Inc., et al.

#### Cr. No. 7399.

United States District Court,
S. D. Ohio, W. D.

June 30, 1949.

Robert H. Winn, Special Assistant to the Attorney General, Ray J. O'Donnell, United States Attorney, Cincinnati, Ohio, Robert E. Marshall, Assistant United States Attorney, Sidney, Ohio, for plaintiff United States.

Robert N. Gorman, of Gorman, Silversteen & Davis, Cincinnati, Ohio, for defendants Universal Milk Bottle Service, Inc., and others.

Nichols, Wood, Marx & Ginter, Cincinnati, Ohio (John J. Luhrman, Cincinnati, Ohio, of counsel), for defendant Matthews-Frechtling Dairy Co.

Orville A. Troy, and Kenneth D. Troy, of Basler, Strauss & Troy, Harry Kasfir, S. Arthur Spiegel, Cincinnati, Ohio, for defendant Cooperative Pure Milk Ass'n.

Michael Lacinak, Cincinnati, Ohio, for defendant J. H. Berling's Dairy Products Co.

Robert G. McIntosh, Cincinnati, Ohio, for defendant Cedar Hill Farms, Inc.

NEVIN, Chief Judge.

At the April term, 1948, the Grand Jury of the United States District Court for the Southern District of Ohio (Western Division) returned an indictment (filed September, 24, 1948) against the above-named defendants, charging them with having violated the provisions of Section 1, Title 15 U.S.C.A., commonly known as the Sherman Anti-Trust Act.

On October 12, 1948, the several defendants, each represented by its own counsel, filed motions to dismiss the indictment for the various reasons and upon the various grounds set forth in each motion respectively. Separate motions were also filed on the same date for a "Bill of Particulars."

At the same time, some of the defendants severally filed a motion "For Inspection of Documents" and on September 24, 1948, the Government filed an "Application for Order Impounding Certain Documentary Evidence." The (several) motions for inspection of documents and the Government's "Application" have heretofore been disposed of, in the one instance by agreement of counsel, and in the other by an order of the court.

The cause is now before the Court, therefore, on the motions of the respective defendants to dismiss and for a Bill of Particulars.

### I. The Several Motions to Dismiss the Indictment.

Briefs in support of and contra the granting of the motions to dismiss, as well as affidavits and documentary evidence have been filed and submitted. In addition, counsel have presented their views somewhat extensively by way of oral argument.

At the outset of the oral arguments, Judge Gorman[1] stated: "Every defendant has filed a motion to dismiss and they are all practically upon the same ground, that is, that the indictment doesn't state an offense against the laws of the United States

---

[1] All told, there are thirteen defendants. Judge Gorman and his associate counsel are counsel for nine of the defendants, to-wit: Universal Milk Bottle Service, Inc., The Coors Brothers Company, The J. Weber Dairy Company, H. Miller Dairy Co. Inc., The J. H. Fielman Dairy Company, G. H. Berling, Inc., H. Woebkenberg Dairy Co., The Hyde Park Dairy Company, and Cincinnati Milk Exchange.

and more particularly you might say on the ground that the indictment alleges a purely intrastate conspiracy but it does not show any substantial economic effect on interstate commerce. We contend that under the Sherman Act there must be a showing of a substantial economic effect on interstate commerce where it is alleged that only an intrastate conspiracy existed."

Defendants further contend that the indictment runs counter to the Order of the Secretary of Agriculture and for that reason the Court has no jurisdiction; that there is no allegation of intent; that the indictment is contradictory and ambiguous to such an extent that trial on it would deprive defendants of their rights under the Fifth and Sixth Amendments; that it is wholly lacking in the clarity and particularity requisite to inform defendants of the nature of the cause as required by the Fifth and Sixth Amendments to the Constitution of the United States; that the motions to dismiss should be sustained because the indictment only charges a conspiracy to raise, fix and maintain the retail and wholesale price of milk in Hamilton County, Ohio, and that the indictment fails to state facts constituting a conspiracy to restrain interstate commerce in that the interstate commerce "comes to rest" and hence the continuing commerce is intrastate, and therefore, the commerce involved is purely intrastate.

The Government submits its argument and authorities based on what it terms as two "doctrines" under either one or both of which it asserts the motions to dismiss should be overruled insofar as they relate to or depend upon the premise either that "there must be a showing of a substantial economic effect on interstate commerce" or that the interstate commerce referred to in the Indictment "comes to rest." These "doctrines" are (a) The "affecting commerce" or "affectation" doctrine and (b) The "flow of commerce" or "in commerce" doctrine.

### (a) The "Affecting Commerce" Doctrine.

In support of their contention that "there must be a showing of a substantial eco-nomic effect on interstate commerce where it is alleged that only an intrastate conspiracy existed" (which defendants assert is the fact here) all of the defendants rely upon the case of U. S. v. French Bauer, Inc. et al., D.C., 48 F.Supp. 260. That case arose in this District. Defendants submit that as it stands unreversed, it is binding upon, or at least, should be followed by this Court in its determination of the present motions.

With reference to the foregoing case, counsel for defendant, The Matthews-Frechtling Dairy Company, say: "There is, as Judge Ford said, no allegation of fact to indicate a direct and substantial restraint upon interstate trade. We, therefore, submit as controlling authority the case of United States v. French Bauer, Inc., et al., [D.C.], 48 F.Supp. 260. This decision by Judge Ford is, to our minds, unanswerable by the United States of America."

Counsel for defendant, The Co-operative Pure Milk Association, submit that the indictment does not allege any fact or any act which directly or substantially affects interstate commerce or the avowed intention, purpose or necessary effect of which was the accomplishment of that result and that the Court in the French Bauer case held that such allegations were absolutely necessary if the indictment was to stand as against a motion to dismiss, such as we have here.

Counsel for defendant, Cedar Hill Farms, Inc., after citing Industrial Association v. U. S., 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849, as bearing decisively upon the question of "Impact upon Interstate Commerce" or the "affecting commerce" doctrine adopts and approves (without further discussion) the arguments presented by Judge Gorman in his brief.

Counsel for defendant, The J. H. Berling's Dairy Products Company, states that in his opinion "the indictment in The United States v. French Bauer case was more far-reaching and more in particular detail than the indictment now under attack," and that upon the authority of that case "this (present) indictment should be dismissed."

In the French Bauer case, French Bauer, Inc., and others were indicted for engaging

in a price-fixing conspiracy in violation of the Anti-Trust Laws. The cause came on before the Court on a motion to quash the indictment, which motion the Court sustained. In the course of the decision, the Court stated, 48 F.Supp.. at page 260: "The conspiracy charged in this indictment is directed to the fixing of prices upon fluid milk which is not moving or intended to move in interstate commerce. The authorities teach that the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, may reach such a conspiracy, but only if the acts charged are·such as directly and substantially affect the commerce in the commodity between the states", and the Court held that there were no factual allegations in the indictment before it sufficient to show direct and substantial impact upon interstate commerce.

It is agreed that the indictment in the instant case is identical with the one before the Court in the French Bauer case, except that in the present indictment there has been inserted paragraph 24, which was not in the indictment in the French Bauer case. As to this, the record shows: "The Court (addressing Mr. Winn, of Counsel for the Government): I was interested first to know whether you agree with the statement ·that this indictment is identical, at least, to all intents and purposes, with the one before Judge Ford (in the French Bauer case), excepting the insertion of this paragraph 24.

"Mr. Winn: I think that is a fair statement. * * * I wouldn't say the indictment was identical with the prior indictment except for paragraph 24. However, the indictment is to all intents and purposes—

"The Court: Is it true it is identical so far ·as any application of the law is concerned?

"Mr. Winn: I think it is identical with the 1942 indictment but for the provisions of paragraph 24."

Paragraph 24 of the present indictment reads as follows: "24. Increases in prices charged by distributors in the Cincinnati Area for milk sold to consumers and ·other purchasers have had and have the effect of reducing the volume of milk purchased by said consumers and other purchasers, thus reducing the quantity ·of milk purchased by said distributors from producers in Kentucky, Indiana and Ohio."

Defendants assert that this allegation is nothing more than a legal conclusion and that in law it ·adds nothing ·to the indictment that was before the court in the French Bauer case; that even with this addition, the present indictment does not charge an offense against any of ·the defendants.

The Government, on ·the other hand, submits that it is a factual ·allegation, that the factual statement is that the increases charged by ·the distributors for milk sold to consumers ·have had, and have the effect of reducing the volume ·of milk purchased by such consumers and other purchasers "·thus reducing the quantity of milk purchased by said distributors from purchasers in Kentucky, Indiana and Ohio."

Counsel for the Government point out that the indictment in ·the French Bauer case alleged no effect upon interstate commerce as a result of an alleged instrastate conspiracy and urge that by the inclusion of paragraph 24 the objection which the Court found to the indictment in ·the French Bauer case is overcome.

■ The Court agrees with the Government's contention that the allegations of Paragraph 24 are factual and are not mere legal conclusions. Under the familiar rule the facts as alleged are admitted, on the pending motions, to be true, for the purposes of this decision.

The "affecting commerce" or "affectation" doctrine was first enunciated by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23.

In Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, decided shortly after the French Bauer case, the Court say, 317 U.S. at pages 120–123, 63 S.Ct. at page 87: "At the beginning Chief Justice Marshall described the federal commerce power with a breadth never yet exceeded. Gibbons v. Ogden, 9 Wheat. 1, 194–195, 6 L.Ed. 23. * * * It was not until 1887 with the enactment ·of the Interstate Commerce Act [49 U.S.C.A. §§ 1 et seq.], that the interstate commerce power began to exert posi-

tive influence in American law and life. This first important federal resort to the commerce power was followed in 1890 by the Sherman Anti-Trust Act and, thereafter, mainly after 1903, by many others. These statutes ushered in new phases of adjudication, which required the Court to approach the interpretation of the Commerce Clause [U.S.Const. Art. 1, § 8, cl. 3] in the light of an actual exercise by Congress of its power thereunder. When it first dealt with this new legislation, the Court adhered to its earlier pronouncements, and allowed but little scope to the power of Congress. United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325. * * * Not long after the decision of United States v. E. C. Knight Co., supra, Mr. Justice Holmes, in sustaining the exercise of national power over intrastate activity, stated for the Court that 'commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518. It was soon demonstrated that the effects of many kinds of intrastate activity upon interstate commerce were such as to make them a proper subject of federal regulation. In some cases sustaining the exercise of federal power over intrastate matters the term 'direct' was used for the purpose of stating, rather than of reaching, a result; in others it was treated as synonymous with 'substantial' or 'material;' and in others it was not used at all. Of late its use has been abandoned in cases dealing with questions of federal power under the Commerce Clause.".

In support of their contention that the indictment must show that a claimed intrastate conspiracy had a direct and substantial effect on interstate commerce, some (but not all) of the defendants cited and relied upon U. S. v. Women's Sportswear Manufacturers Association, D.C., 75 F. Supp. 112. As to this Judge Gorman states: "Briefly, our principal point is that a purely intrastate conspiracy is alleged, and not an interstate conspiracy. Under the law an intrastate conspiracy can only be prosecuted under the Sherman Anti-Trust Act when there is a showing that the intrastate conspiracy had a direct and substantial effect on interstate commerce. Facts must be alleged setting forth the impact on interstate commerce and not merely conclusions of law. First, this indictment does not show such a direct and substantial effect as is necessary to base a valid charge. Such allegations are essential it has been held in many cases, including the recent one of United States v. [Women's] Sportswear Mfrs.' Ass'n., D.C.Mass., 75 F. Supp. 112, decided December 10, 1947, and now on appeal to the Supreme Court of the United States."

Other counsel, notably counsel for the Cooperative Pure Milk Association, assert that they at no time relied upon the Women's Sportswear case, saying: "We believed that the case was clearly distinguishable at the time when the ruling was adverse to the Government and we still feel that the case is distinguishable now that the courts have decided in favor of the Government."

The District Court in the Women's Sportswear case held that the prayer for injunction and other relief should be denied, with judgment for the defendants.

In the course of its decision, the court stated, 75 F.Supp. at pages 117–118: "In summary, there is no evidence of any intent on the part of the defendants, who had no direct and immediate connection with or control over interstate commerce, to burden interstate commerce. There was no evidence of any direct and immediate restraint upon interstate commerce resulting from the defendants' activities, from which an illegal intent can be inferred."

That is the way the case stood at the time the briefs and arguments were submitted in the instant case. Since that time, the Women's Sportswear case has been decided by the Supreme Court of the United States and by that court, reversed. U. S. v. Women's Sportswear Mfg. Ass'n, 336 U. S. 460, 69 S.Ct. 714.

In its opinion, the Court, 336 U.S. at pages 463–464, 69 S.Ct. at page 715, say, among other things: "It seems clear that the intent and effect of the agreement is

substantially to restrict competition and to control prices and markets. * * * The trial court appears to have dismissed the case chiefly on the ground that the accused Association and its members were not themselves engaged in interstate commerce. This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

If, as alleged in Paragraph 24 of the indictment, the conspiracy with which the defendants are here charged results in "reducing the volume of milk purchased by said consumers and other purchasers thus reducing the quantity of milk purchased by said distributors from producers in Kentucky, Indiana and Ohio" then there can be no question but what "it is interstate commerce that feels the pinch."

The indictment herein specifically states (Par. 27) that the defendants conspired to raise, fix and maintain prices; that (Par. 28) they agreed upon and fixed prices; that they agreed to uniform discounts and allowances to wholesale purchasers; that they adhered to the prices and discounts agreed upon; that (Par. 24) increases in prices have had the effect of reducing the quantity of milk purchased by defendants from producers in Indiana and Kentucky; and that (Par. 30) the conspiracy has had the effect of restraining trade and commerce in milk among the several states.

■ Price fixing is illegal per se. U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. The fixing of prices as alleged in the indictment necessarily operates as a direct and substantial restraint on the interstate commerce herein involved and in the indictment referred to.

■ "Substantial economic effect on interstate commerce" does not mean the effect on a specific amount of interstate commerce. It does not run to the quantity that is involved, though in some given case that might be an added factor to be taken into consideration.

As claimed by the Government in argument, the interstate commerce involved may be ever so small. It is not the substantial quantity; it is the substantial effect on interstate commerce. The question is not how much money may be involved or how little the price to the purchaser may be affected.

As stated by the Court in the Filburn case 317 U.S. a page 127, 63 S.Ct. at page 90: "That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 606 et seq., 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; United States v. Darby, supra, 312 U.S. [100] at page 123, 61 S.Ct. [451], 461, 85 L.Ed. 609, 132 A.L.R. 1430."

■ Basing its conclusion on the allegations of the indictment presently before it, the Court is of the opinion and so finds that it does allege facts, even assuming, a "purely intrastate conspiracy" (as claimed by defendants) to show a "substantial economic effect" on interstate commerce and upon the ground, asserted by all of the defendants, that it does not, their respective motions to dismiss are each and all not well taken, and should be overruled.

(b) The "Flow of Commerce" or "in Commerce" Doctrine.

The Government contends that the sales by the defendants occur in the course of interstate commerce, saying: "The flow of fluid milk from producers in Kentucky and Indiana through the defendants to consumers in the Cincinnati Area, described in the indictment, is a continuous day by day flow. Being a perishable commodity, fluid milk cannot be stored or warehoused until a ready purchaser happens along. Immedi-

ate sale is essential. It is obvious that the milk on hand must be sold and delivered each day by the distributors to make room for the milk going through the defendants' plants on the following day. Since 'commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business' (Swift & Co., v. U. S., 1905, 196 U.S. 375, 398, [25 S.Ct. 276, 280, 49 L.Ed. 518]), it would seem that the mere description of the flow of milk establishes its interstate nature until it has been delivered by the distributors to consumers in the Cincinnati area. The pertinent decisions of the Supreme Court fully support this view. Swift & Co. v. U. S. supra. * * * The intention and expectation of a seller and a buyer that the commodity sold would be shipped in interstate commerce is a valid test in determining whether or not the sale is a transaction in interstate commerce, even though completed before the actual physical interstate transportation occurs. U. S. v. Reading Co., 226 U.S. 324, 367 [33 S.Ct. 90, 57 L.Ed. 243]; Lemke v. Farmers' Grain Co., 258 U.S. 50, 53, 54 [42 S.Ct. 244, 66 L.Ed. 458]; Interstate Natural Gas Co. v. Federal Power Commission, 331 U.S. 682, [67 S.Ct. 1482, 91 L.Ed. 1742]; Mandeville [Island Farms] v. [American] Crystal Sugar Co., 334 U.S. 219 [68 S.Ct. 996, 92 L.Ed. 1328]. * * * Sales of milk by producers in Kentucky and Indiana to the defendant distributors are made with the intention and expectation of both parties that the milk would be transported to Ohio and there immediately sold by the distributors. The price to be paid to the producers by the distributors depends upon the amount of that milk which is resold by the distributors to wholesale and retail customers in Ohio, and the price is not determined until after that resale. The resale in Ohio is as integral a part of the interstate commerce as is the sale by the Kentucky and Indiana producers to the distributors."

The Goverment asserts that the Interstate Commerce alleged in paragraphs 21, 22, 23 and 25 of the indictment, is the flow of interstate commerce which was original-ly intended to and does continue through the processing plants of the defendants and their distributors, to the stores and to the purchasers and consumers of milk and that such a price fixing conspiracy affecting the price of milk at wholesale and retail, as here alleged, is a conspiracy in connection with the flow of that commerce and is per se, a violation of the Sherman Act.

In the course of the oral argument, counsel for the Government stated "I am basing my appeal to this court to uphold this indictment under the commerce theory more on the cases that have been decided since the French Bauer decision than anything else" and in this connection, counsel cited U. S. v. St. Louis Dairy Co., D.C.1948, 77 F.Supp. 853, and U. S. v. Happy Valley Farms, Inc., et al.,[2] decided by the District Court of the Eastern District of Tennessee on July 20, 1948. Later, counsel called attention to Standard Oil Co., v. Federal Trade Commission, 7 Cir., 1949, 173 F.2d 210.

In its decision in the St. Louis Dairy case, the court states, 77 F.Supp. at page 859: "We are not unaware of the apparent conflict in our conclusion with that of the District Court for the Southern District of Ohio in United States v. French Bauer, Inc., D.C., 48 F.Supp. 260. * * * The French Bauer opinion apparently disagrees with the rule, as we understand it, that price-fixing is per se a violation of the Sherman Act."

In the Standard Oil case the court say [173 F.2d 213]: "It is not disputed that the petitioner is engaged in commerce, but it is vigorously insisted that commerce ended at the River Rouge plant and the bulk plants in the Detroit Area and that the petitioner's transactions from there on were wholly intrastate. With this we are unable to agree. The break that occurred at River Rouge was a break ir transportation but not in the constant stream of commerce that flowed from the Whiting Refinery to the petitioner's customers in Michigan. * * * The modern concept of commerce is one which gives full sweep to the commerce clause of the Constitution within the

---

[2] No opinion for publication.

limits of the implementing statute, a liberal view of the Congressional purpose as expressed in the statute, and a realistic view of what business is doing as it moves across State lines to accomplish its purpose. The late cases support the view that the petitioner's operations are in commerce from the refinery to its customers. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Binderup v. Pathe Exchange, 263 U.S. 291, 309, 44 S. Ct. 96, 68 L.Ed. 308; Mid-Continent Petroleum Corporation v. Keen, 8 Cir., 157 F.2d 310, 314; Republic Pictures Corporation v. Kappler, 8 Cir., 151 F.2d 543, 545, 162 A. L.R. 228; Walling v. American Stores Co., 3 Cir., 133 F.2d 840."

Defendants insist that the cases relied upon by the Government do not support its claim that sales to consumers in Hamilton County, Ohio, are interstate commerce and that the Government's "in commerce" argument "is not sustained by the decisions."

Counsel for defendants point out in some detail wherein, in their opinion, the cited cases are distinguishable from the instant case, saying: "The Government cites Swift & Co. v. United States, 196 U.S. 375, [25 S.Ct. 276, 49 L.Ed. 518]. That decision is based on the fact that the cattle which were shipped in from various states to the Chicago stockyards had not come to rest in Chicago but were still in the stream of interstate commerce because there was an 'expectation' that the meat would continue on its interstate journey and would be sold in states other than the State of Illinois. The word, 'expectation,' is the language of the Supreme Court in the opinion. The decision is based on the fact that it was expected that the cattle would continue on their interstate journey. * * * In the instant case the Government is not trying to 'reach back' to steps 'prior' to the transportation; instead it is trying to reach ahead to steps after the transportation. It is trying to reach a processed article at a time when there is no purpose of transporting the product in interstate commerce," and further that the recent (Standard Oil) case, for the reasons which they assign, is "not applicable."

■■ The Court, however, agrees with the claim of the Government that today's practical concept of interstate commerce dictates that commodities in interstate commerce remain in that status until they reach the point where the parties originally intended that the movement should finally end. If, as contended by the Government, the distribution and sale of milk at wholesale and retail by the defendants is in interstate commerce, or is an integral part of the interstate flow from the farms of Kentucky and Indiana producers to consumers in Ohio, the point where the parties originally intended that the movement should end, then there can be no doubt but that the conspiracy of the defendants to fix prices at which such sales shall be made constitutes a violation of the Sherman Act.

The Government is correct in its contention that a "practical concept" of interstate commerce must and does lead to the conclusion that the distribution of milk in the Cincinnati area both from the standpoint of time and continuity is so closely and directly related to the interstate flow of milk and so much an inseparable part thereof as to bring this alleged conspiracy within the condemnation of the Sherman Act.

In view of all of the foregoing, the Court is of the opinion and so finds that both upon reason and under the decisions, the Government's "flow of commerce" or "in commerce" argument is sound and sustained. Under this "doctrine" also, therefore, the indictment is immune as against defendants' motions to dismiss.

(c) Other Grounds Asserted by Defendants in Support of Their Motions to Dismiss.

As heretofore stated, in addition to their contention that "under the Sherman Act there must be a showing of a substantial economic effect on interstate commerce, where it is alleged that only an intrastate conspiracy existed" defendants set out other grounds on which they submit their motions to dismiss should be sustained.

In his brief (pages 2–3) Judge Gorman says: "Secondly, milk purchased by dealers or handlers from producers is regu-

lated by the provisions of order No. 65 promulgated by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq. This court is required to take judicial notice of that Order No. 65, which is attached to the motion to dismiss. Under that Order No. 65 the Secretary of Agriculture so regulates milk, exempting the price paid to producers from the provisions of the Sherman Anti-Trust Act, that an examination of the order will show that the statements in paragraph 24 of the indictment are palpably false and untrue. * * * In addition, the indictment fails in several other respects to state an offense. There are inconsistent averments which if given an ordinary construction rebut the inference that an offense was committed."

In this connection, defendants insist that the Court does not have jurisdiction to consider the charges made in the present indictment because of the order of the Secretary of Agriculture, claiming that the action upon the part of the Secretary of Agriculture "cannot be impeached or infringed upon in these proceedings" and that any "challenge to the finding of the Secretary of Agriculture must be addressed to him."

Defendants contend that the Government is here asking "the court to intervene in a field which has already been preempted by the Secretary of Agriculture—a field reserved for him by Congressional Act."

As asserted by the Government, according to the foregoing claims of the defendants, the order of the Secretary of Agriculture serves as a buffer which insulates the defendants from any possibility of violating the Sherman Act. This is not, and cannot be true.

It is true, as the Government points out, that the stated purpose of the order is to "insure" an adequate supply of milk, but nothing contained in the indictment is inimical to, or runs against, or attempts to impeach or infringe upon this order.

The order affects and relates to prices paid to the producers, and has nothing to do with prices charged by distributors to wholesale and retail customers. These prices should be determined by competition and not by conspiracy.

█ The charge in the instant case is a conspiracy to fix prices, contrary to the Sherman Act. Nothing in the order or the Act upon which the order is based authorizes or grants immunity from the Sherman Act for a conspiracy to fix prices of fluid milk sold at retail and wholesale in the Cincinnati area.

The Secretary of Agriculture has authority to determine and adjust minimum producer prices so as to promote and provide for an adequate supply of milk, but he has no authority to take any action concerning a conspiracy to increase distributors' selling prices, with a resultant lessening of demand for fluid milk.

The Court has jurisdiction of this cause.

Finally, defendants claim that the indictment is wholly lacking in the clarity and particularity requisite to inform them of the nature of the charge made against them.

The indictment pleads the charge in sufficient detail to inform defendants that they are charged over a two year period, which is the period referred to in the indictment, with having "engaged in a combination and conspiracy to raise, fix and maintain prices for the sale in the Cincinnati area of milk produced in the States of Kentucky, Indiana and Ohio, which combination and conspiracy in fact has been, and is now, in restraint of the herein before described trade and commerce."

In the case of U. S. v. Happy Valley Farms, Inc.,[2] (hereinabove referred to) the indictment was couched in practically the same language as the one here under consideration.

In that case in response to the same contention as here asserted by defendants, the Court made the following statement: "Suffice to say, the indictment is adequate, both as to form and substance. It states adequately the venue of the crime charged, as being within the jurisdiction of this court. The crime is adequately alleged to have been a continuing conspiracy. The

---

[2] No opinion for publication.

criminal participation of the defendants is sufficiently averred in the indictment. The elements of the crime are not only charged substantially in the language of the statute, but the means whereby the conspiracy is and has been formed and carried on and the details thereof adequate to identify the specific combination and conspiracy, and to enable the defendants to prepare for trial, and to protect them against a new prosecution in event of an acquittal, are likewise all set forth with particularity and definiteness. 'Now, specifically, the indictment is not vague and indefinite; it is not duplicitous. As I say, it clearly charges a restraint of interstate trade and commerce, and an offense under the Sherman Act.'"

 The foregoing statements are applicable in the instant case and the court adopts the language there used, as its decision on the question of lack of clarity and particularity in the indictment. The indictment under consideration is neither vague nor indefinite.

Upon consideration of the motions of the several defendants to dismiss the indictment, the Court is of the opinion and so finds that each of the motions is not well taken and that each and all of them should be, and they are each and all, overruled.

II. Motions for Bill of Particulars.

Motions were filed on October 12, 1948 by and on behalf of each of the several defendants for bill of particulars. It is claimed by defendants that a bill of particulars should be granted to enable them to prepare for trial; to sustain a plea of former jeopardy, and in order that "the ends of justice and orderly procedure may best be served."

 It is a well established rule that it is not the function of a bill of particulars to provide evidence, nor will such a bill be ordered where the information sought is within the knowledge of the defendants, or is information which they have equal opportunity with the Government, to discover.

It appears from the briefs and arguments in support of the respective motions for bill of particulars, that all of the defend-ants' requests are for data or information that fall within the foregoing rule.

Upon consideration of the motions for bill of particulars, together with the allegations of the indictment itself, the Court is of the opinion and so finds that defendants' motions for "Bill of Particulars" are each and all not well taken and that they should be and they are, each and all, overruled.

The Court has caused to be entered in this case appropriate orders overruling the motions to dismiss and the motions for bill of particulars with regard to each and all of the defendants respectively.